IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ANTONIEA DENISE DRAKE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-2597-G-BK |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **Acting Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3*, this case has been referred to the undersigned for Findings, Conclusions, and Recommendation on the parties' cross-motions for summary judgment. For the reasons that follow, it is recommended that Plaintiff's *Motion for Summary Judgment*, Doc. 14, be **GRANTED**, Defendant's *Motion for Summary Judgment*, as construed from her response brief, Doc. 16,[1] be **DENIED**, and the Commissioner's decision be **REVERSED AND REMANDED** for further proceedings.

### I. BACKGROUND[2]

**A.     Procedural History**

Plaintiff seeks judicial review of a final decision by the Commissioner denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

---

[1] Defendant's counsel did not comply with the Court's *Scheduling Order*, Doc 12, which required Defendant to file a cross-motion for summary judgment 30 days after Plaintiff filed her summary judgment motion.

[2] The following background comes from the transcript of the administrative proceedings, which is located at Doc. 11.

Social Security Act ("the Act"). In June 2010, Plaintiff filed her applications for benefits, alleging that she had been disabled since April 2010.[3] Doc. 11-6 at 2-4, 7-9. The Commissioner denied Plaintiff's applications at all administrative levels, and she now appeals to this Court pursuant to 42 U.S.C. § 405(g). Doc. 11-3 at 2; Doc. 11-3 at 17, 20; Doc. 11-5 at 6, 13-14, 18.

**B.     Factual Background**

Plaintiff was born in January 1963, and was 47 years old when she filed her applications for benefits. Doc. 11-7 at 2. She had a high school education plus two years of college, and past relevant work as a teacher's aide, order clerk, and customer service representative. Doc. 11-3 at 69; Doc. 11-3 at 100, 102; Doc. 11-7 at 7.

**C.     Medical History**

Plaintiff's medical record includes a history of rheumatoid arthritis ("RA")[4], Sjogren's syndrome,[5] degenerative disc disease, carpal tunnel syndrome, obesity, bipolar disorder, and attention deficit hyperactivity disorder. In January 2010, Plaintiff's general practitioner, Dr. Susan Fesmire, M.D., referred Plaintiff to Dr. Robert Bulger, M.D., for evaluation of her RA and sciatic and scoliosis pain. Doc. 11-8 at 66. Dr. Bulger determined that Plaintiff's imaging

---

[3] Plaintiff previously filed an application for DIB and SSI benefits which was denied in April 2010. Doc . 11-4 at 5-14.

[4] RA is an inflammatory disease that causes pain, swelling, stiffness, and loss of function in the joints. It can cause mild to severe symptoms. RA not only affects the joints, but may also attack tissue in the skin, lungs, eyes, and blood vessels. http://nihseniorhealth.gov/rheumatoidarthritis/whatisrheumatoidarthritis/01.html  (last visited Sept. 2, 2016). This and other medical definitions not contained in the record are included only to aid the reader and play no part in the determinations made herein.

[5] Sjogren's syndrome is an autoimmune disease that causes dryness in the mouth and eyes and may also affect the joints, lungs, kidneys, blood vessels, digestive organs and nerves. It is sometimes linked to RA. https://www.nlm.nih.gov/medlineplus/sjogrenssyndrome.html (last visited Sept. 2, 2016).

studies showed why she was experiencing increased pain, which warranted a change in her treatment plan and injection therapy as well as a referral to another doctor for her RA. Doc. 11-8 at 64, 66.

In February 2010, Plaintiff saw Dr. Alan Brodsky, M.D., stating that she was generally comfortable and denying significant joint pain or stiffness. Doc. 11-9 at 35. She did complain, however, of low back pain and that she had numbness and tingling in two fingers. Doc. 11-9 at 35. Dr. Brodsky observed that the RA aspect of her ailments was "quiet." Doc. 11-9 at 35. In June 2010, Plaintiff described herself as "overall generally comfortable" despite falling and sustaining a shoulder injury ten days earlier. Doc. 11-8 at 68.

In September 2010, Plaintiff again stated that she was overall generally comfortable and denied significant joint pain or swelling. Doc. 11-9 at 33. However, she reported morning stiffness that lasted for 60-90 minutes and variable in nature, and a prominent decrease in her energy level that varied from day to day. Doc. 11-9 at 33. Dr. Brodsky remarked that, despite reasonably good control of the RA and good grip strength, Plaintiff had "significant constitutional complaints" with prominent morning stiffness, and she felt incapable of sustaining a full time job because she could not predict how she would feel in the morning and whether she could get to work on time. Doc. 11-9 at 33.

Plaintiff underwent a physical consultative examination in February 2011 performed by Dr. Kelley Davis, D.O. Doc. 11-9 at 21-24. Dr. Davis first observed that Plaintiff exhibited diminished muscle and grip strength in the left upper extremity as well as 4/5 strength in her quadriceps, hamstrings, and calves. Doc. 11-9 at 23. Both knees demonstrated crepitus,[6] and paraspinal muscle tenderness was found throughout the cervical, thoracic, and lumbar spine.

---

[6] The grating of a joint; noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together. STEDMANS MED. DICTIONARY, 211900 & 211920 (Nov. 2014).

Doc. 11-9 at 23. Dr. Davis noted that Plaintiff had difficulty using her right hand, exhibited slow conventional and tandem walking, and had decreased sensation and swelling in both ankles. Doc. 11-9 at 23. Dr. Davis's impressions included (1) RA with chronic pain and arthritis; (2) hypertension; (3) decreased vision; (4) hypothyroidism; and (5) chronic sinusitis. Doc. 11-9 at 24. In closing, Dr. Davis noted that "although a patient may appear to be fit for return to employment, there is no guarantee that the patient can be a viable employee." Doc. 11-9 at 24.

Plaintiff returned to Dr. Brodsky in March 2011, and he noted that Plaintiff was "generally uncomfortable with increasingly significant joint pain, swelling, stiffness affecting both shoulders, with prominent decrease in range of motion," despite having good grip strength. Doc. 11-9 at 30. Dr. Brodsky administered injections to both shoulders and recommended physical therapy. Doc. 11-9 at 30.

In December 2011, Plaintiff presented for a joint pain consultation with Dr. Catalina Orozco, M.D., a rheumatologist. Doc. 11-9 at 93. Plaintiff reported that she had discontinued her prescription Methotrexate because it caused extreme fatigue, and she had experienced increased pain since then. Doc. 11-9 at 93. Dr. Orozco examined Plaintiff and found no spinal tenderness to palpation over the spinous process, although she did note severe tenderness in both shoulders as well as the right elbow with mild swelling in one joint. Doc. 11-9 at 96. Plaintiff exhibited eight out of 18 tender points and presented with a normal gait and intact and symmetric strength and reflexes. Doc. 11-9 at 96. X-rays of her hands taken that day revealed inflammatory polyarthritis with erosive regions bilaterally. Doc. 11-9 at 83.

In February 2012, Dr. Orozco noted that Plaintiff had RA, fibromyalgia, and Sjogren's syndrome. Doc. 11-9 at 91. She indicated that Plaintiff had joint pain and swelling, muscle tenderness, and morning stiffness for approximately one hour. Doc. 11-9 at 88. However, by the

4

time of the appointment, Plaintiff demonstrated zero of the 18 tender points used to evaluate fibromyalgia, a normal range of motion in her spine, no joint tenderness, and swelling in only one joint. Doc. 11-9 at 90. Plaintiff rated her pain as six on a scale of ten, and reported that the pain in her shoulders and feet was an eight while she was lying in bed, but a two when she got up and walked around. Doc. 11-9 at 88. Dr. Orozco observed that Plaintiff had attained significant improvement in her swollen and tender joints and continued her on the same medicine regimen. Doc. 11-9 at 91.

In May 2012, Plaintiff returned to Dr. Orozco, reporting myalgias, arthralgia, and arthritis as well as stiffness in the morning with partial improvement on medications. Doc. 11-11 at 43. She reported difficulty with her activities of daily living. Doc. 11-11 at 43. Dr. Orozco concluded that Plaintiff's RA was "moderate," and her fibromyalgia was demonstrating "significant disease activity with pain, fatigue, and non-restorative sleep." Doc. 11-11 at 46. By July 2012, Plaintiff reported severe, achy pain and morning fatigue and stiffness. Doc. 11-11 at 32. Dr. Orozco characterized her as having moderate disease activity in relation to her RA and mild disease activity as to her fibromyalgia, and she increased Plaintiff's medication. Doc. 11-11 at 34.

In October 2012 and January 2013, Plaintiff reported feeling better with her medications, although she continued to endorse moderate pain. Doc. 11-11 at 16; Doc. 11-11 at 25. During her visits with Dr. Orozco throughout 2013 and into 2014, Plaintiff sometimes reported improvement. Doc. 11-11 at 3, 6; Doc 11-11 at 16; Doc. 11-11 at 34; Doc. 11-13 at 6, 8; Doc. 11-14 at 48. Other times, however, she had moderate to severe joint pain and inflammation with symptoms that fluctuated from time to time. Doc. 11-11 at 12; Doc. 11-11 at 46; Doc. 11-13 at 3. Similarly, her tender points significantly varied over time, ranging from zero to 16 on an 18-

5

point scale.  Doc. 11-9 at 96; Doc. 11-11 at 5; Doc. 11-11 at 11, 19; Doc. 11-11 at 33; Doc. 11-11 at 45, 50; Doc. 11-13 at 5; 11-14 at 47.  In February 2014, Dr. Orozco noted that Plaintiff's symptoms would "usually come and go," and she was currently doing well, but would require close monitoring and continued medication in the future.  Doc. 11-14 at 45, 48.

In connection with her DIB and SSI applications, Plaintiff obtained medical source statements from a number of doctors.  In August 2010, state agency consultant Dr. John Durfor, M.D., opined that Plaintiff could stand/sit/walk for six hours in an eight-hour work day, frequently lift ten pounds, and she had an unlimited ability to push and pull.  Doc. 11-8 at 109.  In March 2011, another consultant, Dr. Patty Rowley, M.D., reported that Plaintiff could perform light work activity albeit with some limitations.  Doc. 11-9 at 69-70.

In May 2012, Dr. Orozco opined that Plaintiff could only sit for three hours, stand and walk for one hour, and would need to lie down for four hours of an eight-hour workday due to her pain, swelling, and fatigue.  Doc. 11-10 at 43.  Dr. Orozco found that Plaintiff would have to frequently elevate her legs and change position throughout the workday, could only occasionally lift up to ten pounds, and was limited in her ability to grasp, push, pull and manipulate fine objects.  Doc. 11-10 at 43-44.  In conclusion, Dr. Orozco determined that Plaintiff would miss work four or more days a month due to pain.  Doc. 11-10 at 45.  Dr. Orozco submitted a second report in January 2014, in which she repeated many of the same observations from her earlier report, and additionally noted that Plaintiff would be off task for over 15 minutes per hour.  Doc. 11-13 at 79.

**D.     Administrative Hearing**

At the administrative hearing, Plaintiff testified that she had been getting chemotherapy[7] once a week for her RA since 2009, which caused her to have nose sores, dry mouth, and diarrhea, and it took a day or two to recover from the injection. Doc. 11-3 at 50-51. On a "flare day," which she had two to three times a month, she did not get up at all. Instead she would increase her medication and the doctor would prescribe a steroid for her. Doc. 11-3 at 54-55. She did not go to the hospital or doctor every time she had a flare because she had access to the medications she needed. Doc. 11-3 at 55.

**E.     ALJ's Findings**

In March 2014, the ALJ issued an unfavorable decision, applying the customary five-step sequential analysis. Doc. 11-3 at 20. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability. Doc. 11-3 at 22. At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: RA with secondary Sjogren's syndrome; history of adhesive capsulitis; degenerative disc disease and mild scoliosis; sciatica; obesity; carpal tunnel syndrome; fibromyalgia; bipolar disorder; major depressive disorder; and a history of attention deficit hyperactivity disorder. Doc. 11-3 at 22. At step three of the analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity for a presumptive finding of disability. Doc. 11-3 at 23.

The ALJ then issued a residual functional capacity assessment ("RFC") determining that Plaintiff was partially limited in her abilities to perform a number of tasks, including lifting

---

[7] Plaintiff testified that she injects herself once a week with a drug called Methotrexate which is used to treat both RA and, at higher doses, cancer. Doc. 11-3 at 72; Doc. 11-8 at 63; https://www.drugs.com/pro/methotrexate-injection.html (last visited Sept. 2, 2016).

weight, standing, sitting, walking, reaching, climbing and the like. Doc. 11-3 at 24. In consideration of those limitations, the ALJ concluded that Plaintiff was incapable of performing any of her past relevant work. Doc. 11-3 at 28. However, at step five of the analysis, the ALJ found that Plaintiff could perform other work in the national economy, including counter clerk, furniture rental clerk, and bakery worker conveyor line. Doc. 11-3 at 29. On this basis, the ALJ concluded that Plaintiff was not disabled. Doc. 11-3 at 29-30.

## II. APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing her past work, a finding of "not disabled" must be made; (5) if an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or

8

is not disabled. *Id.* If the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett*, 67 F.3d at 564. Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### III. ARGUMENT AND ANALYSIS

Although the Court need not address all of the issues in reaching a decision in this case, as will be discussed more fully below, the issues Plaintiff presents, as reordered and interpreted by the Court, are as follows:

> 1. Whether the ALJ erred when she did not specifically address whether Plaintiff could hold a job on a regular, continuing basis given the nature of her impairments;
>
> 2. Whether the ALJ erred in not specifically applying the multifactor analysis in 20 C.F.R. §404.1537 when she gave little weight to two of Plaintiff's treating physicians, Drs. Brodsky and Orozco; and
>
> 3. Whether the ALJ reversibly erred by failing to explain the weight she gave to two opinions from treating physician Dr. Fesmire.

Doc. 15 at 6.   Plaintiff also argues that the ALJ erred in failing to consider Plaintiff's ability to work on a regular, continuing basis given the nature of her RA which waxes and wanes in intensity.  Doc. 15 at 32.

Defendant responds that the ALJ did find that Plaintiff could sustain work on a continuous basis when she determined Plaintiff's RFC, which necessarily incorporates such finding.  Doc. 16 at 16-17.   Further, Defendant argues that Plaintiff did not demonstrate that her RA waxes and wanes such that the ALJ was required to address her ability to sustain continual employment.  Doc. 16 at 15-16.

An ALJ need not make a finding regarding a claimant's ability to maintain employment in every case.  *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  Inherent in the definition of RFC is the understanding that the claimant has an ability to work on a sustained basis.  *Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003).  Thus, "[u]sually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment."  *Frank*, 326 F.3d at 619.  The appellate court made clear in *Frank* that the ALJ only needs to make a specific finding regarding a claimant's ability to maintain work where, "by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."  *Id.*  Further, "in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time."  See *id.* at 619-20.

The *Frank* court gave an example of the type of evidence that might require a separate finding of whether a claimant had the ability to maintain employment:  "For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment

10

because every number of weeks she lost movement in her legs, this would be relevant to the disability determination." *Id.* at 619. On the other hand, a claimant's testimony that his back pain caused him to have both good and bad days "simply do[es] not rise to the level of impairment anticipated by the Court in *Frank* ." *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). Specifically, in *Perez*, (1) the plaintiff claimed that his pain waxed and waned between epidural injections, which were given over time; (2) he had "good days and bad days"; and (3) his expert witness testified that he did not believe the plaintiff could reliably work a 30-hour week. *Id.* at 465-66.

The appellate court found that this was not sufficient to bring the claimant's case within the scope of *Frank* because "[i]t is axiomatic that the pain from any type of ailment will vary in intensity, especially the farther one gets from treatment that alleviates pain." *Id.* at 465; *cf. Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986) (finding that while a claimant may be capable of finding a job and working for short periods of time, it may be that "[t]he nature of the mental impairment is such . . . that the claimant is unable to remain employed for any significant period of time.").

RA is "a disease that by its very nature is prone to flare-ups and affects not only the joints but other areas of the body as well." *McGhee v. Astrue*, No. 10-CV-424-BH, 2010 WL 2941204 , at *8 (N.D. Tex. 2010) (Ramirez, J.)  In *McGhee,* the Court noted that the plaintiff experienced periodic flare-ups and symptoms such as dry eyes, morning stiffness, arthritic pain, difficulty with attention, tender points, depression, and poor sleep.  2010 WL 2941204, at *8.  Further, the plaintiff testified she experienced flare-ups, and two of her treating doctors predicted that she would miss more than three days of work each month, exceeding the one day deemed acceptable by employers.  *Id.* at *9.  Thus, the court held that the plaintiff's evidence went "beyond merely

good days and bad days," and the ALJ's failure to not explicitly address the plaintiff's ability to sustain work on a continuing basis was reversible error. *Id*.

As in *McGhee*, Plaintiff's same diagnosis of RA is also characterized by its episodic features and the way in which it waxes and wanes over time. *Cf. Frank*, 326 F.3d at 619; 2010 WL 2941204, at *26-27. There is substantial evidence to support this in view of Plaintiff's medical records, which document periods of increased symptoms at times and fewer symptoms at other times, her treating physicians' opinions, one consulting doctor's opinion; Plaintiff's testimony, case law, and the medical literature.[8] Under these circumstances, the ALJ was required to determine whether Plaintiff could maintain employment on a regular, continuing basis. By failing to make that determination, the ALJ committed legal error. *Frank*, 326 F.3d at 619-29; *Singletary*, 798 F.2d at 828.

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quotation omitted). However, the ALJ's failure to specifically determine whether plaintiff could hold whatever job she found for a significant period of time is legal error. When the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990). Accordingly, reversal and remand is warranted. The remaining issues that Plaintiff raises need not be addressed in this Court as she can raise them on remand. 20 C.F.R. §

---

[8] *See, e.g.,* http://nihseniorhealth.gov/rheumatoidarthritis/whatisrheumatoidarthritis/01.html ("RA affects people differently. Some people have mild or moderate forms of the disease, with periods of worsening symptoms, called flares, and periods in which they feel better, called remissions. Others have a severe form of the disease that is active most of the time. . .") (last visited Sept. 2, 2016).

416.983 (providing that when a case is remanded from federal court, the ALJ may consider any issues relating to the claim).

### IV. CONCLUSION

For the foregoing reasons, it is recommended that Plaintiff's *Motion for Summary Judgment*, Doc. 14, be **GRANTED**, Defendant's *Motion for Summary Judgment*, Doc. 16, be **DENIED**, and the Commissioner's decision be **REVERSED AND REMANDED** for further proceedings.

**SO RECOMMENDED** on September 6, 2016.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. See *Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE